UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEVEN ROBERT JAFFE,

          Petitioner,

    v.

EDMUND G. BROWN, JR., Governor, and JEFFREY BEARD, Secretary of the California Department of Corrections and Rehabilitation,

          Respondents.

Case No.  05-cv-04439-PJH

**ORDER DENYING SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS; GRANTING CERTIFICATE OF APPEALABILITY**

Re: Dkt. No. 80

Before the court is the second amended petition of Steven Robert Jaffe ("petitioner"), who is represented by counsel, for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The court ordered respondents to show cause why the writ should not be granted on the Confrontation Clause claim.  Respondents filed a supplemental answer and supporting points and authorities.  Petitioner responded with a traverse.  For the reasons set forth below, the petition is DENIED.

## BACKGROUND

### A.    Factual Summary

In 2003, a jury in Alameda County Superior Court convicted petitioner of seven counts, including five counts arising from his simultaneous possession of methamphetamine, cocaine, a nine-millimeter handgun, a .25 caliber handgun, and ammunition.  Petitioner was also convicted of possessing cocaine while armed with a loaded, operable nine-millimeter handgun and a loaded, operable .25 caliber handgun. The trial court sentenced petitioner to a total term of nine years and four months in state prison.

The following summary of evidence and argument presented at trial is taken from the unpublished opinion of the California Court of Appeal:

TRIAL EVIDENCE

On Tuesday, January 15, 2002, at about 6:30 p.m., a passerby, Gaddi Ittah, found defendant unconscious in a parking lot at a strip mall in Sunnyvale. Defendant was face down on the ground with his feet in the open driver's door of a running BMW. Since defendant was unresponsive, Ittah called 911 on his cellular telephone. Other passersby tried to rouse defendant and determined that he was drunk.

Paramedics and Sunnyvale public safety police and fire officers responded to the emergency call. A fire official found defendant slumped over inside the car, which was no longer running. Defendant, who smelled strongly of alcohol, regained consciousness and vomited more than once.

Lieutenant Randal French, a fire officer, asked if anyone had the keys to the car. A bystander handed Lieutenant French the keys, saying they were taken from the car's ignition.

Officer David Miller, the crime scene investigator, retrieved defendant's wallet from defendant's back pocket. Officer Miller handed the wallet to Officer Kathryn Debeaubien, who looked through it for identification. She found defendant's driver's license and credit cards bearing defendant's name. Defendant's address was in Topanga in southern California. Officer Debeaubien did not look closely at the contents of the wallet, which was bulging with numerous papers. Officer Debeaubien handed the wallet to Officer Christopher Kassel, who quickly perused it before handing it back to Officer Miller.

Defendant was arrested for public intoxication and transported to a hospital in an ambulance. After searching the car, Officer Kassel gave the car keys to the company that towed the BMW.

The BMW was registered to a Thomas Miller who lived in southern California. Before the car was towed, Officers Debeaubien and Kassel did an inventory search. The car looked lived in, with numerous articles of clothing and papers strewn about the passenger compartment. In the car's trunk were more clothing and 12 to 15 pieces of mail addressed to defendant.

On the floor of the front passenger seat were empty vodka bottles and a briefcase. Opening the briefcase revealed that it contained a nine-millimeter semiautomatic handgun loaded with seven rounds in its magazine, a .25-caliber semiautomatic handgun loaded with six rounds in its magazine, a .177-caliber pellet gun, and 58 loose rounds of ammunition, consisting of 33 nine-millimeter rounds, 23 .25-caliber rounds, and 2 .22-caliber birdshot long bullets. Five of the rounds were hollow point, a type of bullet designed to do more damage on impact. The serial number was scratched off the nine-millimeter gun. Also in the briefcase were a sock and a wallet containing the business card of someone other than defendant. No paper identifying defendant was in the

2

briefcase.  All three guns were in evidence, secured with plastic straps by the police so that the guns could not be fired.

Defendant stipulated that he "has been convicted of an offense enumerated in Penal Code section 12021.1([b])."[1]

Officer David Miller's preliminary examination testimony was read to the jury.  Officer Miller found a bindle containing .48 grams of methamphetamine in defendant's wallet.  An expert testified that this was a usable amount of methamphetamine.  Neither officer, Debeaubien or Kassel, had observed a bindle in the wallet.  As the crime scene investigator, Officer Miller took the wallet and briefcase and their contents and booked them into evidence at the Sunnyvale Department of Public Safety.

A blood sample was taken from defendant at the hospital at 10:23 p.m.  The blood test revealed a blood alcohol level of .23 and the presence of cocaine metabolites, which meant that defendant had consumed cocaine sometime between six to 72 hours earlier.  No methamphetamine was found in his blood.

Officer Debeaubien stayed with defendant at the hospital from about 7:30 p.m. until 1 a.m.  Defendant asked her what he was being charged with.  She said possessing firearms and methamphetamine and being drunk in public.  Defendant asked if she had found the cocaine.  She said she had not.  Defendant said it was in his jacket.  She said there were several jackets in the car.  Defendant specified a black sport coat on the front seat.  Officer Debeaubien called this information in to Lieutenant Tim Davis, who asked Officer Miller to check it out.

Officer Miller found a bindle containing 2.89 grams of cocaine in the pocket of a jacket that was draped over the driver's seat and covered with vomit.  An expert testified that this was a usable amount of cocaine.

The parties stipulated, "David Miller was an officer with the Sunnyvale Department of Public Safety.  On July 23rd, 2002 he was fired for his alleged involvement in helping houses of prostitution in the city of Sunnyvale.  Charges have been filed against him, but they do not include the allegations of fabrication of evidence.  The charges against him are allegations and are not evidence."

Defendant made a telephone call from the hospital to someone named "Tom."  Officer Debeaubien dialed the number for him and recognized the area code as from southern California.

---

[1]    In this case the prosecutor sought to prove that defendant had a prior violent offense conviction of robbery that precluded him from possessing weapons or ammunition.  (Pen. Code § 12021.1.)  Defendant argued in limine that he could prevent the jury from hearing the details of his prior conviction by stipulating that he had a qualifying conviction.  The prosecutor agreed under *People v. Valentine* (1986) 42 Cal.3d 170, 177, and defendant entered the quoted stipulation.

United States District Court
Northern District of California

TRIAL ARGUMENT

Defense counsel conceded that defendant had access to the car and its contents.  He argued to the jury that others also had access to the car and they abandoned their efforts to help defendant when they heard the police had been called, because they knew what the briefcase contained.  Among these "fair weather friends," he asserted, was the car's registered owner, Tom Miller.  He further argued that the jury should distrust hearsay evidence of fired Officer David Miller about finding the methamphetamine in the defendant's wallet and the cocaine in his jacket.

Based on defendant's hospital telephone call to "Tom," the prosecutor argued that defendant had called Tom Miller, the car's owner, in southern California, so Tom Miller could not have been among those present when defendant was discovered intoxicated in the car.

Answer, Ex. A (*People v. Jaffe*, No. H026265, slip op. at 2-5 (Cal. Ct. App. Oct. 13, 2004)) (footnote in original).

## B.    Procedural History

Petitioner appealed the state court judgment and concurrently filed a habeas petition in the court of appeal.  The court of appeal modified the judgment by striking the conviction for the count of simple possession of cocaine on the grounds that it was a lesser-included offense of possessing cocaine while armed with a loaded, operable handgun, and by striking certain fees and penalty assessments; as modified, the judgment was affirmed.  The court of appeal summarily denied the petition for a writ of habeas corpus.  Petitioner then filed two petitions for review in the California Supreme Court, one seeking review of the court of appeal's decision on direct appeal and one seeking review of the court of appeal's summary denial of the habeas petition.  The California Supreme Court initially granted review of the court of appeal's decision on direct appeal, but subsequently dismissed its decision granting review on September 7, 2005.  The California Supreme Court also summarily denied review of the habeas petition.

Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, asserting eleven cognizable claims for habeas relief, including his claims that his right to due process was violated because the prosecutor failed to disclose prior to the preliminary hearing that one of the prosecution's witnesses, Officer David Miller ("Miller"),

1    was under investigation for committing federal crimes, and that trial counsel rendered

2    ineffective assistance in failing to seek to exclude Miller's testimony on due process

3    grounds.  The court denied the habeas petition by order entered March 30, 2009.  On

4    July 24, 2009, the court denied petitioner's request for a certificate of appealability

5    ("COA").

6         Petitioner appealed, and on November 17, 2010, the United States Court of

7    Appeals for the Ninth Circuit granted a COA on four issues, including a Confrontation

8    Clause challenge to the admission of Officer Miller's preliminary hearing testimony, which

9    was not addressed in the order to show cause, in the March 30, 2009 order denying the

10   habeas petition, or in the state court petitions that preceded this federal action.  On

11   appeal, petitioner elected not to pursue one of the issues certified for appeal, namely,

12   whether the evidence was sufficient to sustain his convictions for possession of cocaine

13   while armed with an operable handgun, including the related claims of prosecutorial

14   misconduct and ineffective assistance of counsel.  By memorandum disposition entered

15   April 4, 2012, the court of appeals affirmed the denial of habeas relief on the two

16   remaining issues that had been addressed by this court in its March 30, 2009 order, that

17   is, whether the prosecutor's failure to disclose evidence prior to the preliminary hearing

18   regarding witness Miller violated petitioner's due process rights under *Brady v. Maryland*,

19   373 U.S. 83 (1963), and whether trial counsel rendered ineffective assistance by failing to

20   object to the prosecutor's misstatements of the law.

21        As to the fourth issue certified for appeal, the Ninth Circuit perceived a

22   Confrontation Clause claim in petitioner's November 1, 2005 petition that was not

23   addressed by this court, and concluded that although the claim was not "fairly presented"

24   to the state courts and it was not entirely clear that petitioner "raised" such a claim before

25   this court, it was nevertheless "sufficiently argued" in the papers before this court to

26   warrant further proceedings.  The Ninth Circuit further suggested that it found the

27   Confrontation Clause claim to be potentially meritorious, noting that it was "exceedingly

28   troubled by Confrontation Clause implications that arise from the admission of [Officer

United States District Court
Northern District of California

5

David] Miller's preliminary hearing testimony at trial," but that it was unable to reach the merits of the claim because petitioner had not exhausted it before the state appellate courts.  While concluding that the claim was not exhausted, the Ninth Circuit remanded the matter for this court to "determine in the first instance whether any California procedure remains available to Jaffe for raising [the unexhausted Confrontation Clause claim]," and if so to "exercise its discretion to determine whether Jaffe's petition should be stayed pursuant to either of the procedures outlined in *King* [*v. Ryan*, 564 F.3d 1133, 1140-41 (9th Cir. 2009)]."

On remand, the court dismissed the Confrontation Clause claim identified by the Ninth Circuit, granted petitioner's motion to stay the petition pending state court proceedings to attempt to exhaust the Confrontation Clause claim, and ordered petitioner to return to this court to amend the petition within 30 days after the state courts had completed their review.  Doc. no. 73.  Petitioner's exhaustion effort took the form of a motion to recall the remittitur.  After the court of appeal summarily denied the motion to recall the remittitur on June 12, 2013, and the California Supreme Court denied a petition for review on October 2, 2013, petitioner filed an amended petition on October 25, 2013, which alleged a Confrontation Clause claim.

After the court issued an order to show cause why the first amended petition should not be granted, petitioner filed a motion for leave to file a second amended petition to add a claim for ineffective assistance of appellate counsel, which was opposed by respondent.  The court granted leave to amend and set filing deadlines for respondent to answer or otherwise respond to the second amended petition.  Respondent filed a motion to dismiss, which was granted in part and denied in part by order entered June 27, 2014.  Doc. no. 95.  The court dismissed the claim for ineffective assistance of appellate counsel and ordered respondent to file an answer responding to the Confrontation Clause claim.  The matter is fully briefed and suitable for decision without oral argument.

United States District Court
Northern District of California

Because petitioner has been released from custody since the time he filed his initial habeas petition, counsel for respondents propose that the Secretary of the California Department of Corrections and Rehabilitation ("CDCR"), Jeffrey Beard, be named the sole respondent to the second amended petition.  Answer at 1, n.1 (citing Rule 2 of the Rules Governing Habeas Corpus Cases Under Section 2254, Advisory Committee Notes, 1976 Adoption, subd. (b)(2) ("The applicant is on probation or parole due to the state judgment he is attacking.  The named respondents shall be the particular probation or parole officer responsible for supervising the applicant, and the official in charge of the parole or probation agency, or the state correctional agency, as appropriate.").  Petitioner did not object to or take a position regarding the state's assertion that Beard is the proper respondent.  Traverse at 1, n.1.   In the absence of a dispute over the appropriate respondent, Jeffrey Beard, as Secretary of the CDCR, is substituted for Matthew Kramer, Warden, pursuant to Rule 25(c) of the Federal Rules of Civil Procedure.  Governor Edmund G. Brown, Jr., who was provisionally identified by the court of appeals, remains a named respondent.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to

1  that reached by [the Supreme] Court on a question of law or if the state court decides a

2  case differently than [the Supreme] Court has on a set of materially indistinguishable

3  facts." *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable

4  application of" Supreme Court authority, falling under the second clause of § 2254(d)(1),

5  if it correctly identifies the governing legal principle from the Supreme Court's decisions

6  but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

7  The federal court on habeas review may not issue the writ "simply because that court

8  concludes in its independent judgment that the relevant state-court decision applied

9  clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the

10  application must be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

11        Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

12  determination will not be overturned on factual grounds unless objectively unreasonable

13  in light of the evidence presented in the state-court proceeding."  *Miller-El*, 537 U.S. 322

14  at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

15        When there is no reasoned opinion from the highest state court to consider the

16  petitioner's claims, the court looks to the last reasoned opinion.  *See Ylst v. Nunnemaker*,

17  501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.

18  2000).  Where the state court gives no reasoned explanation of its decision on a

19  petitioner's federal claim and there is no reasoned lower court decision on the claim, a

20  review of the record is the only means of deciding whether the state court's decision was

21  objectively reasonable.  *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Delgado*

22  *v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  When confronted with such a decision, a

23  federal court should conduct an independent review of the record to determine whether

24  the state court's decision was an objectively unreasonable application of clearly

25  established federal law.  *Himes*, 336 F.3d at 853; *Delgado*, 223 F.3d at 982.

26  **DISCUSSION**

27        Petitioner claims that the trial court permitted the prosecution to introduce the prior

28  testimony of a key prosecution witness, Officer David Miller, in violation of petitioner's

United States District Court
Northern District of California

8

1  right to effective cross-examination guaranteed by Sixth and Fourteenth Amendments.

2  Petitioner contends that he did not have an opportunity to cross-examine Miller effectively

3  at the preliminary hearing about Miller's criminal activities because the state did not

4  disclose to the defense that Miller was under investigation for a variety of federal crimes.

5  As the court determined in the order denying in part respondents' motion to

6  dismiss the second amended petition, the Confrontation Clause claim was fairly

7  presented to the California Supreme Court and denied on the merits without a reasoned

8  opinion. Doc. no. 95 at 10-13. The court will therefore conduct an independent review of

9  the record to determine whether the state court's decision was contrary to, or an

10  objectively unreasonable application of, clearly established federal law. *Harrington v.*

11  *Richter*, 562 U.S. 86, 97-103 (2011); *Himes*, 336 F.3d at 852-53; *Delgado*, 223 F.3d at

12  982.

13  **A.     Legal Standard**

14  The Confrontation Clause of the Sixth Amendment provides that in criminal cases

15  the accused has the right to "be confronted with the witnesses against him." U.S. Const.

16  amend. VI. The federal confrontation right applies to the states through the Fourteenth

17  Amendment. *Pointer v. Texas*, 380 U.S. 400, 403 (1965).

18  The ultimate goal of the Confrontation Clause is to ensure reliability of evidence,

19  but it is a procedural rather than a substantive guarantee. *Crawford v. Washington*,

20  541 U.S. 36, 61 (2004). It commands, not that evidence be reliable, but that reliability be

21  assessed in a particular manner: by testing in the crucible of cross-examination. *Id.*; *see*

22  *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (noting a primary interest secured by the

23  Confrontation Clause is the right of cross-examination). The Clause thus reflects a

24  judgment, not only about the desirability of reliable evidence, but about how reliability can

25  best be determined. *Crawford*, 541 U.S. at 61; *see, e.g., United States v. Medjuck*, 156

26  F.3d 916, 919 n.1 (9th Cir. 1998) (Confrontation Clause serves purposes of ensuring that

27  witnesses will testify under oath, forcing witnesses to undergo cross-examination, and

28  permitting the jury to observe the demeanor of witnesses.); *Wood v. Alaska*, 957 F.2d

United States District Court
Northern District of California

1    1544, 1549 (9th Cir. 1992) (the right to confrontation includes the right to cross examine

2    adverse witnesses and to present relevant evidence).

3            The Confrontation Clause applies to all "testimonial" statements.  *See Crawford*,

4    541 U.S. at 50-51.  "Testimony . . . is typically a solemn declaration or affirmation made

5    for the purpose of establishing or proving some fact."  *Id.* at 51 (internal quotation and

6    citation omitted); *see id.* ("An accuser who makes a formal statement to government

7    officers bears testimony in a sense that a person who makes a casual remark to an

8    acquaintance does not.").  The Confrontation Clause applies not only to in-court

9    testimony but also to out-of-court statements introduced at trial, regardless of the

10   admissibility of the statements under state laws of evidence.  *Crawford*, 541 U.S. at 50-

11   51.

12           Out-of-court testimonial statements offered for the truth of the matter asserted, i.e.,

13   "testimonial hearsay," are barred under the Confrontation Clause unless (1) the

14   witnesses are unavailable, and (2) the defendants had a prior opportunity to cross-

15   examine the witnesses.  *Crawford*, 541 U.S. at 59.  In *Crawford*, the Supreme Court

16   overruled its prior holding in *Ohio v. Roberts*, 448 U.S. 56 (1980), that such statements

17   may be admitted so long as the witness is unavailable and the statements have

18   "adequate indicia of reliability," i.e., fall within a "firmly rooted hearsay exception" or bear

19   "particularized guarantees of trustworthiness."  *Crawford*, 541 U.S. at 59 (quoting

20   *Roberts*, 488 U.S. at 66).  *Crawford* replaces the "open-ended balancing test" of *Roberts*

21   with a bright-line formula: where testimonial hearsay is at issue, the Sixth Amendment

22   demands a prior opportunity for cross-examination of the declarant.  *See id.* at 68.  The

23   absence of this opportunity alone is enough to make out a Confrontation Clause violation.

24   *Id.*

25           *Crawford*, which announced a "new rule" for purposes of *Teague* analysis, was

26   decided on March 8, 2004, while petitioner's conviction was still pending on direct review,

27   and is applicable here.  *Whorton v. Bockting*, 549 U.S. 406, 416 (2007) ("a new rule is

28   generally applicable only to cases that are still on direct review") (applying *Teague v.*

United States District Court
Northern District of California

10

*Lane*, 489 U.S. 288, 310-316 (1989)).  Respondent cites *Crawford* as the applicable

standard, and there is no dispute that *Crawford*, rather than *Roberts*, governs the

Confrontation Clause claim here.  *See* Suppl. Answer at 3.

For purposes of federal habeas review, "[a] showing of constitutional error under

the Sixth Amendment only merits grant of the petition for habeas corpus if the error was

not harmless, that is, if it had a 'substantial and injurious effect or influence in determining

the jury's verdict.'"  *Holley v. Yarborough*, 568 F.3d 1091, 1100 (9th Cir. 2009) (quoting

*Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)); *Hernandez v. Small*, 282 F.3d 1132,

1144 (9th Cir. 2002) (same).

**B.      Sixth Amendment Violation**

Petitioner claims that the preliminary hearing testimony of prosecution witness

Officer David Miller was admitted at trial in violation of petitioner's right of effective cross-

examination under the Sixth Amendment.  At the time of the preliminary hearing,

petitioner's defense counsel was not aware that Miller was under investigation for

criminal activity and did not have an opportunity to cross-examine Miller about his

unlawful activities.  Beginning in April 2000, Sunnyvale police officers assisted the F.B.I.

in an undercover investigation of Miller's involvement with individuals running prostitution

operations in Sunnyvale.  Answer, Ex. G (Clerk's Transcript ("CT")) at 71, 160-62.  The

preliminary hearing examination was held in petitioner's case on April 10, 2002, at which

Miller testified that he found methamphetamine in petitioner's wallet and cocaine in

petitioner's jacket.  CT at 28, 34-35.  On July 22, 2002, Miller was charged in a sealed

complaint in federal court with various counts of racketeering and interfering with

commerce by threat and violence.  CT at 146-51.  On July 23, 2002, Miller was fired by

the Sunnyvale Department of Public Safety.  Answer, Ex. H (Reporter's Transcript ("RT"))

at 416.  The court takes judicial notice of the docket in Miller's criminal proceedings which

indicates that he was convicted pursuant to a plea to two counts of conspiracy to commit

extortion under color of official right affecting interstate commerce in violation of 18

U.S.C. § 1921(a).  *United States v. David Lee Miller, Jr.*, No. CR 02-20107 JW (N.D. Cal.).

On September 26, 2002, the prosecutor provided the superior court with documents detailing the investigation of and pending charges against Miller, and the superior court turned the documents over to the defense the same day.  CT at 138. Approximately three weeks later, the presentation of evidence began at petitioner's trial. Because he was under federal indictment, Miller exercised his Fifth Amendment right not to testify at petitioner's trial, and due to his unavailability, Miller's preliminary hearing testimony was read to the jury.  RT at 349, 399-405.

Petitioner argues that he was denied the right to have the opportunity to cross-examine the declarant of an out-of-court statement, as recognized in *Crawford,* when the prosecution was permitted to read Miller's prior testimony to the jury and to rely on that evidence to obtain a conviction.  Petitioner does not dispute that Miller was unavailable for the purpose of introducing his out-of-court statement at trial, and respondents acknowledge that Miller's preliminary hearing testimony was testimonial for purposes of *Crawford* analysis.  Petitioner contends that he was denied a prior opportunity to cross-examine Miller about his illegal activities which were under investigation at the time he testified at the preliminary hearing, and that Miller's testimony was improperly admitted. *See Crawford*, 541 U.S. at 59.

1.      **Unavailability of Impeachment Evidence**

Respondents argue that at the time of the preliminary hearing, even if trial counsel had been aware of the investigation, no form of impeachment yet existed because Miller was under investigation and no criminal charges had been filed against him at the time of the preliminary hearing.  Respondents speculate that Miller could not have answered questions about the confidential investigation, because he would not have been aware that he was under investigation.  Respondents reason that even if Miller had been aware of the investigation, he would not likely have admitted to any incriminating conduct. Thus, respondents contend that any impeachment of Miller at the time of the preliminary

1    hearing "would have been confined to some unidentified admissible extrinsic evidence."

2    Suppl. Answer at 4.  Respondents thus appear to concede that if Miller's illegal conduct

3    had been somehow disclosed to defense counsel at the time of the preliminary hearing,

4    defense counsel would have cross-examined him with questions about his involvement

5    with houses of prostitution and the activity that led to the charges of conspiracy to commit

6    extortion under color of official right, for which Miller was ultimately convicted.

7            Respondents argue that there is no controlling Supreme Court authority

8    addressing the question whether a defendant's prior opportunity to cross-examine a

9    witness is affected by the fact that alleged impeachment evidence was unavailable or

10   even withheld at the time of the witness's prior testimony.  Suppl. Answer at 4-5 (citing

11   authorities).  Petitioner concedes that the Supreme Court has not addressed a

12   Confrontation Clause claim with the precise fact pattern presented here, where the

13   defendant had an opportunity to cross-examine the witness at the time of the preliminary

14   hearing, but significant impeachment evidence, i.e., the witness's criminal conduct, was

15   not available at the time the witness testified.  The Supreme Court has recognized,

16   however, that "the lack of a Supreme Court decision on nearly identical facts does not by

17   itself mean that there is no clearly established federal law, since 'a general standard' from

18   this Court's cases can supply such law."  *Marshall v. Rodgers*, 133 S. Ct. 1446, 1449

19   (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)), *reh'g denied*, 133 S. Ct.

20   2408 (2013).  *Crawford* clearly established that "[w]here testimonial statements are at

21   issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one

22   the Constitution actually prescribes: confrontation."  *Crawford*, 541 U.S. at 68-69.

23           In arguing that there was no violation of the Confrontation Clause because

24   impeachment evidence was unavailable at the time that Miller testified at the preliminary

25   hearing, respondents fail to address authority recognizing that the Confrontation Clause

26   protects the defendant, at the time of trial, against the admission of prior testimony that

27   was not subject to cross-examination.  *See Crawford*, 541 U.S. at 59 ("Testimonial

28   statements of witnesses absent from trial have been admitted only where the declarant is

United States District Court
Northern District of California

unavailable, and only where the defendant has had a prior opportunity to cross-examine.").  The federal court decisions cited by respondents do not foreclose application of *Crawford* to petitioner's Confrontation Clause claim, which presents undisputed evidence in the record that impeachment material was discovered after Miller testified at the preliminary hearing but before his prior testimony was admitted at trial.  *See Williams v. Bauman*, 759 F.3d 630, 635 (6th Cir.), *cert. denied,* 135 S. Ct. 876 (2014) (finding no Confrontation Clause violation in the admission of prior testimony of a deceased witness who testified at the petitioner's preliminary hearing and was subject to cross-examination, where the petitioner "failed to identify any Supreme Court precedent supporting his contention that his opportunity to cross-examine [the witness] at his own preliminary hearing was inadequate to satisfy the rigors of the Confrontation Clause"); *Carter v. Chappell*, 2013 WL 1120657, *157; 2013 U.S. Dist. LEXIS 37480 (S.D. Cal. Mar. 18, 2013) (denying Confrontation Clause claim based on the argument that the trial court erred in admitting a deceased witness's prior testimony despite the prosecution's alleged misconduct in failing to timely reveal a forensic report that could have allowed an additional avenue of cross-examination, which the court considered in adjudicating the *Brady* claim, reasoning that "the Supreme Court has clearly indicated that 'the right to confrontation is a *trial* right, designed to prevent improper restrictions on the type of questions that defense counsel may ask during cross-examination' and is not 'a constitutionally compelled rule of pretrial discovery'") (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 52 (1987); *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)).  Respondents also cite out-of-circuit authority applying the pre-*Crawford* standard for confrontation-based claims, which does not govern petitioner's claim here.  *See Woodfox v. Cain*, 609 F.3d 774, 800 (5th Cir. 2010) (analyzing right to confrontation under *Roberts,* habeas relief was not warranted on an ineffective assistance claim for failure to object to admitting a deceased witness's prior trial testimony where impeachment evidence was discovered after the first trial and the impeachment evidence was presented to the jury in the second trial, noting "[t]here is no question but that sworn testimony, such as Brown's, given at a

14

prior hearing where the defendant had an opportunity to cross-examine the now-unavailable witness, ordinarily meets the *Roberts* test for admission under a firmly rooted exception to hearsay") (citing *Roberts*, 448 U.S. at 68).

Ninth Circuit authority recognizes that *Crawford* protects the right to confrontation at the time of trial, even if the impeachment material was not available when the witness previously testified.  In *United States v. Wilmore*, 381 F.3d 868, 872-73 (9th Cir. 2004), *modified on other grounds by United States v. Larson*, 495 F.3d 1094, 1106 (9th Cir. 2007) (en banc), the defendant appealed from his conviction on one count of being a felon in possession of a firearm.  The Ninth Circuit reversed and remanded for a new trial, holding that, under *Crawford*, the trial court's limitations on the cross-examination of a witness who had inculpated the defendant in her grand jury testimony and then at trial invoked her Fifth Amendment privilege against self-incrimination, violated the defendant's rights under the Confrontation Clause.  At trial, the witness disavowed her grand jury testimony that the defendant had a gun, and invoked her Fifth Amendment privilege after being advised that lying before the grand jury is a crime of perjury.  *Wilmore*, 381 F.3d at 870-71 and n.3 (noting that at trial, the witness testified, "I was upset. I had just went to jail for drugs when we had this grand jury so, of course, I said that, but I was upset. I didn't see Earnest with no gun. I didn't see him with a gun at all, period.").  The court in *Wilmore* held that the district court should have at least struck all the witness's testimony, or allowed meaningful cross-examination of her.  381 F.3d at 873.  The court of appeals determined that the witness's assertion of her Fifth Amendment privilege, coupled with the district court's restriction on cross-examination, made the witness "unavailable" with regard to her grand jury testimony, leaving the defendant with no opportunity to "confront" the witness about why she testified the way she did before the grand jury or about whether that testimony was true.

The court in *Wilmore* noted that the case was distinguishable from *Crawford*, where the issue presented was the admissibility of a statement made by an unavailable hearsay declarant, whereas in *Wilmore*, there was no dispute about the admissibility of

1    the grand jury testimony at the time it was admitted at trial, but only after the witness

2    asserted her Fifth Amendment privilege.  The Ninth Circuit held that the timing of when

3    the witness became unavailable did not affect the defendant's right to confrontation under

4    *Crawford*:

> Because it was only after the evidence was admitted that [the witness] became unavailable, this case concerns not so much the admission of evidence as the effect of the subsequent restriction on cross-examination and the invocation of the Fifth Amendment.  However, we do not find that this distinction is persuasive.  There can be no question that, regardless of when a declarant becomes unavailable, the core principle of *Crawford* is that the defendant must have the opportunity for cross-examination with regard to "testimonial evidence" such as grand jury testimony.

11    381 F.3d at 872-73 & n.6.

12        In light of *Wilmore,* the protections of the Confrontation Clause recognized in

13    *Crawford* are not limited by whether impeachment material was available at the time the

14    witness gave his prior testimony.  In *Wilmore*, the defendant did not have an opportunity

15    to cross-examine the witness when she testified before the grand jury, and the

16    impeachment material was not available until trial when the witness contradicted her own

17    prior testimony.  The court of appeals found a Confrontation Clause violation because the

18    district court kept the witness's prior testimony in evidence even after the witness

19    asserted her Fifth Amendment privilege and the defense was limited to cross-

20    examination on topics other than the grand jury testimony.  *Wilmore*, 381 F.3d at 873

21    ("Wilmore was entitled to probe into whether Ms. John was testifying in return for

22    government leniency for legal troubles of her own, or even whether, as Wilmore

23    suggested at trial, Ms. John lied to the grand jury to obscure the fact that the coat was

24    hers.").  Similarly, here, Miller's prior testimony was admitted at trial even though the

25    impeachment evidence against Miller was not available at the time he gave his prior

26    testimony, and petitioner was given no opportunity to cross-examine Miller about his

27    criminal conduct to undermine the credibility of his preliminary hearing testimony after

28    Miller invoked the Fifth Amendment privilege.

United States District Court
Northern District of California

United States District Court
Northern District of California

## 2.      Opportunity for Effective Cross-Examination

Respondents also argue that petitioner had a "fair opportunity" to cross-examine Miller at the preliminary hearing, and that defense counsel did not ask Miller any questions when given the opportunity to cross-examine him.  Suppl. Answer at 5 (citing CT 35).  Respondents' argument overlooks the undisputed fact that the evidence of Miller's illegal activities had not been disclosed to defense counsel at the time of the preliminary hearing, and petitioner did not have an opportunity to demonstrate Miller's possible bias or unreliability as a witness.  Without such impeachment evidence, petitioner did not have the opportunity for effective cross-examination at the preliminary hearing to test Miller's credibility.

Under clearly established Supreme Court authority, the right to confrontation includes "the right of effective cross-examination."  *Davis v. Alaska*, 415 U.S. 308, 318 (1974).  In *Davis*, the Court articulated that "exposure of a witness' motivation in testifying is a proper and important function" of cross-examination:

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.  Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.  One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness.  By so doing the cross-examiner intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony.  The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness. . . .

*Davis*, 415 U.S. at 316-17.  As the Court held in *Van Arsdall*, "[w]e think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of

1    the witness.'" *Delaware v. Van Arsdall,* 475 U.S. 673, 680 (1986) (quoting *Davis*, 415

2    U.S. at 318).

3         In *Van Arsdall,* the Supreme Court recognized that "'the Confrontation Clause

4    guarantees an opportunity for effective cross-examination, not cross-examination that is

5    effective in whatever way, and to whatever extent, the defense might wish.'" *Van Arsdall*,

6    475 U.S. at 679 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam)).

7    Respondents argue that "the Supreme Court has never suggested a lack or even

8    deprivation of particular impeachment evidence may render a defendant's opportunity to

9    cross-examine inadequate." Suppl. Answer at 6.  Respondents thus suggest that

10   petitioner cannot establish a Confrontation Clause violation simply because he was

11   unable to conduct a particular form of cross-examination that, in hindsight, might have

12   been more effective.  *Id.* at 5.  This argument erroneously presumes, however, that

13   petitioner had an "adequate opportunity to cross-examine" Miller even though

14   "prototypical" impeachment material, i.e., Miller's prior criminal conduct, was not available

15   to defense counsel.  *See Crawford,* 541 U.S. at 57 ("Our later cases conform to *Mattox's*

16   holding that prior trial or preliminary hearing testimony is admissible only if the defendant

17   had an adequate opportunity to cross-examine.") (citing *Mattox v. United States*, 156 U.S.

18   237 (1895)).  *Crawford* clearly establishes that the government is prohibited from

19   introducing testimonial evidence at trial against a criminal defendant where the declarant

20   is unavailable and there was no opportunity for effective cross-examination at the time

21   the prior testimony was given.  *See Crawford*, 541 U.S. at 68 ("In this case, the State

22   admitted [the witness's tape-recorded testimonial statement to police] against petitioner,

23   despite the fact that he had no opportunity to cross-examine her.  That alone is sufficient

24   to make out a violation of the Sixth Amendment.").

25        Here, Miller did not have a criminal record at the time he testified at the preliminary

26   hearing, but because the criminal investigation was not disclosed until after Miller

27   testified, petitioner was denied the opportunity to question Miller about his prior, if not

28   ongoing and contemporaneous, criminal conduct to discredit his testimony.  *See Davis*,

415 U.S. at 316 ("The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness.").  The record demonstrates that a Confrontation Clause violation occurred when Miller's testimony was admitted at trial despite petitioner's lack of opportunity to conduct an effective cross-examination.

**C.    Harmless Error Analysis**

A showing of constitutional error under the Sixth Amendment only merits habeas relief if the error was not harmless under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  *Holley*, 568 F.3d at 1100.  Petitioner contends that the deprivation of his right to confront Miller and conduct an effective cross-examination had a substantial and injurious effect or influence in determining the jury's verdict.  2d Am. Pet. at 12 (citing *Brecht*). Petitioner argues that the state could not have convicted him of the drug possession charges without Miller's testimony because Miller claimed to have found the bindles of methamphetamine in petitioner's wallet and the cocaine in petitioner's jacket.  Traverse at 14-15.  Further, because two of the gun counts were based on the allegation that petitioner possessed the guns while he was in possession of cocaine, petitioner contends that Miller's testimony was crucial to the jury's verdict convicting petitioner of the two counts of possession of controlled substance while armed under Cal. Health & Safety Code § 11370.1.  Traverse at 14 n.7.

Respondents argue that any Confrontation Clause error was harmless, citing the court's order denying petitioner's *Brady* claim, asserted in the initial habeas petition, which alleged that the prosecutor failed to disclose impeachment evidence about Miller prior to the preliminary hearing.  Suppl. Answer at 6-7.  In the order denying the initial habeas petition, the court held that there was no due process violation because the prosecution disclosed the impeachment evidence of Miller three weeks before the presentation of evidence at trial, and that there was no prejudice from the failure to disclose the evidence prior to the preliminary hearing:

> Prejudice will be found from a *Brady* violation if the prosecutor's non-disclosure of favorable evidence caused the defendant to receive an unfair trial, that is, if the missing

evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *See Kyles* [*v. Whitley*, 514 U.S. 419, 434-35 (1995)]. Petitioner argues that if the evidence had been disclosed to the defense prior to the preliminary hearing, Officer Miller would not have testified at the preliminary hearing. This, petitioner argues, would have prevented the prosecutor from being able to present at trial testimony by Officer Miller about finding methamphetamine in petitioner's wallet and finding cocaine in petitioner's jacket. Even assuming petitioner is correct in this regard, Miller's preliminary hearing testimony at trial was largely duplicative of other, more credible testimony. Officer Kassel testified that he saw Miller remove the items from petitioner's wallet, including the bindle of methamphetamine. RT at 296-99, 305-09. Petitioner's cocaine possession was established by the cocaine found in his blood, as well petitioner's admission to Officer Debeaubien that he had cocaine in his jacket pocket, where she directed Miller to find it. Resp. Ex. A at 2-4, CT at 27. Kassel and Debeaubien were more credible witnesses than Miller in that they had not been impeached with evidence of being fired based on federal criminal charges. As Miller's preliminary hearing testimony was a duplicative and relatively weak part of the evidence against petitioner, its absence would have made little difference to petitioner's trial. Therefore, the failure to disclose the Miller impeachment evidence prior to the preliminary hearing did not prejudice petitioner by undermining confidence in the jury's verdict.

Doc. no. 42 at 8-9. Because petitioner was proceeding without the assistance of counsel when the court denied the initial habeas petition, he implicitly asks the court to reconsider the harmless error analysis with respect to Miller's testimony. Traverse at 15 n.8.

The petition having been remanded for further proceedings on the Confrontation Clause claim, the court will reconsider the issue whether Miller's testimony had a "substantial and injurious effect" on the outcome of the trial, in light of the arguments and citations to the record raised by counsel. To guide an analysis of whether a Confrontation Clause violation had "substantial and injurious effect," the court considers the five non-exclusive factors articulated by the Supreme Court in *Van Arsdall*: (1) the importance of the witness's testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case.

1  *Merolillo v. Yates*, 663 F.3d 444, 455 (9th Cir. 2011) (citing *Van Arsdall*, 475 U.S. at 684;

2  *Ocampo v. Vail*, 649 F.3d 1098, 1114 (9th Cir. 2011); *Fowler v. Sacramento Co. Sheriff's*

3  *Dept.*, 421 F.3d 1027, 1041–42 (9th Cir. 2005); *Whelchel v. Washington*, 232 F.3d 1197,

4  1206 (9th Cir. 2000)).

5      As the state courts did not issue a reasoned decision in denying the Confrontation

6  Clause claim, the court conducts an independent review of the record to determine

7  whether the state court's decision was an objectively unreasonable application of clearly

8  established federal law.  *Richter*, 562 U.S. at 97-103; *Himes*, 336 F.3d at 852-53;

9  *Delgado*, 223 F.3d at 982.  The court applies the *Van Arsdall* framework in weighing the

10  parties' arguments on the question of harmless error.

11      **1.      Importance of Witness's Testimony**

12      Petitioner argues that admission of Miller's testimony in violation of the

13  Confrontation Clause had a substantial and injurious effect or influence in determining the

14  verdict because "Miller's testimony was the *sine qua non* of the prosecution's case

15  regarding all of the drug-related offenses."  2d Am. Pet. at 12.  Petitioner points out that

16  at one point during the proceedings, the prosecutor described Miller's testimony as "the

17  heart of the drug charges in this case."  RT 350.  The prosecutor made these remarks

18  when arguing, outside the presence of the jury, that Miller's testimony at the preliminary

19  examination should be admitted under the former testimony exception to the hearsay

20  rule, due to Miller's unavailability in light of the federal criminal charges pending against

21  him and his exercise of his Fifth Amendment right.  In the context of addressing the issue

22  whether defense counsel had the right and the opportunity to cross-examine Miller at the

23  preliminary examination "with an interest and motive similar to that which he has at the

24  hearing," pursuant to Evidence Code § 1291, the prosecutor argued as follows:

25      [Prosecutor:]  Counsel had the same motive and interest in
       impeaching Officer Miller at the prelim.  His testimony was
26      essential at the prelim in terms of the discovery of the
       cocaine, the discovery of the methamphetamine.
27
       Credibility of a witness is always at issue.  It wasn't a
28      tangential issue at the prelim.  If Miller didn't testify to finding

> the cocaine, or if the court didn't believe Miller, that he found the cocaine, or the meth, then there would not have been a holding order in that case.
>
> His testimony wasn't peripheral to this case. It wasn't some remote issue. It was the heart of the drug charges in this case. The fact that defense counsel chose not to cross-examine Miller or question him doesn't affect 1291.

RT 349-50. Defense counsel objected to admission of Miller's testimony, arguing that "we did not have a similar interest and motive in cross-examining David Miller at the time of the preliminary examination that we would in this case at this time." RT 354. In admitting Miller's testimony under the hearsay exception for former testimony of an unavailable witness, the trial court understood the prosecutor's argument as pointing out that petitioner had an opportunity to impeach Miller at the preliminary examination about discovering the drugs if drug possession had been a matter of dispute:

> [Trial Court:] Thank you. The court is of the opinion that the defense did have a similar motive to cross-examine Officer Miller at the preliminary hearing. Credibility is always at issue, number one.
>
> And if in fact the defense in this case, or one of the defenses in this case, is that Officer Miller planted the drugs, let's say, either the methamphetamine in his wallet or the cocaine allegedly found in the jacket, if that is the defense contention, then that well could have been the defense contention at the preliminary hearing.
>
> In other words, if it's the defendant's assertion that he never had one drug or the other, and that for the very first time those drugs came up because Officer Miller planted those drugs in either the wallet or in the jacket, then certainly Officer Miller could could [sic] have been asked those questions at the preliminary hearing.

RT 354-55. When read in context, the prosecutor's statement about the importance of Miller's testimony on the issue of discovering the drugs was not a concession that Miller's testimony was essential to proving possession, but rather an argument that defense counsel had an opportunity to cross-examine Miller about whether he discovered the drugs in petitioner's wallet or jacket, and elected not to do so. More importantly, during his closing argument, the prosecutor did not emphasize Miller's prior testimony to establish drug possession, citing other evidence supporting the discovery of

methamphetamine in petitioner's wallet and cocaine in petitioner's jacket, as discussed more fully below.  *See* RT 450-82.

Miller's testimony was important on the sole issue of where he found the drugs, but in light of other testimonial evidence and physical evidence presented at trial, including petitioner's admission that he had cocaine in his jacket, Miller's testimony was not important to establish that petitioner exercised control over or the right to control controlled substances to prove possession.  Although the importance of Miller's testimony is limited to the question whether Miller discovered the drugs in Miller's wallet and jacket, or planted the drug evidence, this factor weighs against a finding of harmless error.

### 2.  Whether Testimony Was Cumulative

#### a.  Methamphetamine

Respondent argues that Miller's testimony was cumulative of other evidence, based on the court's earlier determination that "'Miller's preliminary hearing testimony at trial was largely duplicative of other, more credible testimony.'"  Answer at 6 (quoting doc. no. 42 at 8-9).  With respect to the conviction for possession of methamphetamine, respondent cites evidence that Officer Kassel watched as Miller took inventory of the contents of petitioner's wallet at the evidence lab.  Specifically, Officer Kassel testified that he saw Miller remove two bindles from the petitioner's wallet, watched Miller conduct the presumptive test on one of the bindles, and confirmed that the test showed positive for methamphetamine.  Answer at 7 (citing RT 296-97, 305-07).  Petitioner responds that without Miller's testimony there was no admissible evidence that petitioner possessed methamphetamine because Miller claimed to have found the bindles in petitioner's wallet and booked them into evidence, and that Officer Kassel's testimony "amounted to nothing more than inadmissible hearsay."  Traverse at 15.  Officer Kassel testified, however, that he watched Miller empty out petitioner's wallet in the evidence lab: "He took out and inventoried the entire contents of the wallet, and he also took out two bindles."  RT 296. Officer Kassel further testified that Miller said "Look what we have here" in a "half surprised," "sarcastic" manner as he took the bindles out of the wallet.  RT 305-06.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Officer Kassel also saw Miller conduct a presumptive test of the contents of the bindles.

2  RT 297.  Thus, Officer Kassel offered credible testimony based on what he observed,

3  independent of Miller's prior testimony, that the wallet taken from petitioner when he was

4  arrested contained a substance that later tested positive for methamphetamine.  Officer

5  Kassel's testimony rendered Miller's prior testimony cumulative on discovering the

6  presence of a bindle containing methamphetamine in petitioner's wallet, weighing in favor

7  of finding the Confrontation Clause error harmless.

8      **b.**  **Cocaine**

9     With respect to the cocaine possession charges, however, there was no other

10  witness who was present when Miller found the bindle containing cocaine in petitioner's

11  jacket, which was left in the car when it was towed from the scene.  Thus, the record

12  demonstrates that Miller's testimony was not cumulative on the issue of whether he

13  discovered the bindle of cocaine in petitioner's jacket, weighing against a finding a

14  harmlessness.

15      3.  **Corroborating or Contradicting Evidence**

16      **a.**  **Methamphetamine**

17     As discussed above, Officer Kassel corroborated Miller's prior testimony that two

18  bindles were found in petitioner's wallet.  RT 296.  One of the bindles contained white

19  crystal powder, which was marked at trial as People's Exhibit 16.  The state's

20  criminologist testified that the substance tested positive for methamphetamine.  RT 379-

21  80.  The bindle containing methamphetamine was admitted into evidence.  RT 418; CT

22  330.

23     At trial, defense counsel pointed to contradicting evidence about the timing of

24  Miller's discovery of the bindle of methamphetamine taken from petitioner's wallet.  RT

25  495.  In the portion of the preliminary examination testimony read at trial, Miller testified

26  that he did a presumptive test of the suspected methamphetamine at the scene:

27        Q: Did you find any items in the car that you recognized as
      being a narcotic?

28

1        A: Yes.

2        Q: Where did you find that item?

3        A: Well, the defendant had a wallet in his back pocket. I took
4        the wallet out, and there was a bag inside there that contained
methamphetamine.

5        . . .

6        Q: Okay.   You testified earlier that you examined the
7        defendant's wallet, correct --

        A: Yes.
8

9        Q: -- Mr. Jaffe, and there was a white substance that you
found inside there?

10       A: I found a white paper bindle that contained what I believed
11       to be a controlled substance.
        . . .

12       Q: Did you recognize the substance in the defendant's wallet
13       as methamphetamine?

14       A: I had a strong suspicion, so I tested it and did a
presumptive test out in the field.

15   RT 401, 404-04, 405.

16       Defense counsel argued in closing that Miller's prior testimony that he conducted a

17   field test for the substance found in the wallet was inconsistent with Officer Kassel's

18   testimony that Miller was in the evidence room when he declared "Look what we have

19   here" in a "sarcastic" tone and pulled two bindles out of the wallet.  RT 305, 495.

20   Although there is no evidence in the record that Miller actually claimed to have first

21   discovered the bindles in the evidence room, rather than in the field, Miller's prior

22   testimony that he conducted a "presumptive test out in the field" is inconsistent with

23   Officer Kassel's testimony that Miller pulled out the bindles from petitioner's wallet and

24   conducted a presumptive test in the evidence room.  This weighs against a finding of

25   harmless error as to the conviction for possession of methamphetamine.

26       **b.**    **Cocaine**

27       With respect to the conviction on the count of cocaine possession and the two

28   counts of possession of cocaine while armed with a loaded, operable firearm, petitioner

United States District Court
Northern District of California

25

United States District Court
Northern District of California

1   argues that without Miller's testimony, there was insufficient proof that petitioner

2   possessed cocaine because Miller was the officer who purportedly found cocaine in

3   petitioner's jacket.  Respondent points out that corroborating evidence of cocaine

4   possession was presented at trial: (1) the prosecution's toxicologist testified that

5   petitioner's blood test showed the presence of cocaine metabolites, RT 314-18; (2) a

6   criminalist independently confirmed that the substance retrieved from petitioner's jacket

7   by Miller was cocaine, RT 385; and (3) Officer Debeaubien testified that petitioner told

8   her that he had cocaine in one of his jackets in the car, RT 224, 246, 270.

9         First, the toxicologist opined that the presence of the cocaine metabolite

10   benzoylecgonine, or "B.E.," indicated that petitioner had ingested cocaine sometime

11   within 6 to 72 hours prior to having his blood drawn.  RT 315, 318, 324.  The toxicologist

12   also testified that cocaine stays in the blood for about 3 to 6 hours, and clarified that

13   cocaine was not found in petitioner's blood sample.  Petitioner argues that the presence

14   of B.E., and not cocaine, is not sufficient to prove that petitioner was in possession of

15   cocaine at the time he possessed the guns, which were the basis of the charges that he

16   was in possession of a controlled substance while armed.  However, the presence of B.E.

17   established petitioner's cocaine use and corroborated the other evidence that petitioner

18   was in possession of cocaine when he was arrested, including petitioner's own

19   admission.  In closing argument, the prosecutor pointed out that the presence of B.E. in

20   petitioner's blood, which indicated that petitioner used cocaine at least 6 hours before he

21   was arrested and gave a blood sample, undermined the suggestion that Miller might have

22   planted the cocaine in petitioner's jacket after his arrest because cocaine metabolites

23   could not have been planted in petitioner's blood sample.  RT 478.

24         Second, the property clerk testified that Miller was a crime scene investigator and

25   that Miller submitted a property report when items were booked into evidence, including

26   the bindle containing some substance which was marked at trial as People's Exhibit 19.

27   RT 335, 357-59, 364.  The property report forms submitted by Miller were introduced into

28   evidence at trial as business records.  RT 336; CT 330.  The prosecutor's criminalist

1  testified that he tested the substance in the paper bindle and determined that it was

2  cocaine.  RT 383-85.  The bindle of cocaine was also admitted into evidence.  RT 418;

3  CT 330.  This physical evidence and the accompanying business records corroborated in

4  part Miller's prior testimony that he transported and booked into evidence a bindle

5  containing suspected cocaine that he found in petitioner's vomit-covered jacket.  RT 400,

6  404.  As defense counsel argued at trial, however, there was no evidence at trial to

7  corroborate Miller's testimony on the "real issue" of "what did David Miller do with [the

8  drug evidence] before he brought it?  Where did he find it before it came to that property

9  room?"  RT 500.

10          Third, Miller's prior testimony that he found cocaine in petitioner's jacket was

11 corroborated by petitioner's own admission that he had cocaine in his jacket.  Officer

12 Debeaubien testified that petitioner was taken from the scene at 1214 Apollo Way to the

13 hospital in an ambulance, and she followed the ambulance in her own vehicle.  RT 221.

14 At the hospital, Officer Debeaubien told petitioner that he was being charged for

15 possession of loaded firearms, drunkenness in public, and possession of

16 methamphetamine.  RT 224.  Officer Debeaubien testified that petitioner "asked me if I

17 found the cocaine, and I told him I did not find any cocaine. . . . He told me that it was in

18 his jacket."  RT 224.  Petitioner described the jacket as a black sport coat, which was on

19 the front seat of the vehicle.  RT 246.  Officer Debeaubien then called Lieutenant Davis

20 from the hospital with information about petitioner's statement and asked to have

21 someone check the car at the tow yard.  RT 225.

22          Lieutenant Davis testified that Officer Debeaubien called him from the hospital with

23 additional information, "saying that the person that she had in custody told her that there

24 was additional evidence in this case, drugs, in the car that we had towed.  And she

25 wanted to know if I could arrange to have someone go and pick up the evidence."  RT

26 406-07.  Davis testified that he contacted Miller by telephone and sent out Miller to the

27 tow yard to look for additional drugs.  RT 407-08.  Miller's preliminary hearing testimony

28 about discovering the cocaine was read into the record as follows:

United States District Court
Northern District of California

Q: Were you assigned to go look for a jacket, a certain type of jacket, in the car and see if you found any drugs in there?

A: Yes.

Q: Did you find a jacket in the car with drugs in it?

A: Yes.

Q: What type of drug did you recognize that to be in the jacket?

A: I believed it to be cocaine.

Q: Do you recall whether or not the jacket was in the front seat or the back seat of the car?

A: It was draped on the driver's seat, so I guess most of it was in the back passenger area.

Q: Where was the vehicle when you searched it for the jacket?

A: At the tow yard.

Q: You don't know whether or not the jacket was in the same position it was in when the defendant was in the car, last in the car?

A: Because of the condition of the jacket I don't think anybody would have touched it.

Q: It had vomit on it?

A: Yes.

RT 404.

Petitioner argues that without Miller's testimony that he found cocaine in petitioner's jacket, petitioner's admissions to Officer Debeaubien could not have supported a conviction for cocaine possession under the corpus delicti rule.  Traverse at 16 (citing *People v. Ochoa*, 19 Cal. 4th 353, 404 (1998)).  The state supreme court has summarized that rule as follows:

> The law of *corpus delicti* contains "two distinct, though related, concepts . . . .  First, the corpus delicti is a necessary element of the prosecution's case in a criminal trial . . . . Thus, a precondition to conviction is that the state prove that a 'crime' has been committed-otherwise there could not possibly be guilt, either in the accused or in anyone else.  [¶]  The second concept is closely related to the first. The '*corpus delicti* rule'

28

prohibits the prosecutor from establishing the corpus delicti . . . through the use of the extrajudicial statements of the defendant. [Citations.] Thus the state must prove the *corpus delicti* independently of the accused's out-of-court declarations. The rule further provides that once the *corpus delicti* has been proved by such evidence *aliunde*, the extrajudicial statements then become admissible to determine the defendant's connection with the crime." (Comment, California's Corpus Delicti Rule: The Case for Review and Clarification (1973) 20 UCLA L.Rev. 1055, fn. 1.) A defendant cannot be held to answer a criminal complaint following a preliminary examination unless the magistrate is satisfied that the *corpus delicti* has been established. (§§ 859b, 871, 872.)

"The purpose of the *corpus delicti* rule is to assure that 'the accused is not admitting to a crime that never occurred.'" (*People v. Jones* (1998) 17 Cal.4th 279, 301.) Hence, before a confession may be introduced "'slight corroborating facts'" (*People v. Jones* (1867) 31 Cal. 565, 569) must show independently "that a crime has been committed by someone" (*People v. Cobb* (1955) 45 Cal.2d 158, 161).

Significant here, "the prosecution need not eliminate all inferences tending to show a noncriminal cause of [the harm]. Rather, the foundation may be laid by the introduction of evidence which creates a reasonable inference that the [harm] could have been caused by a criminal agency [citation], even in the presence of an equally plausible noncriminal explanation of the event." (*People v. Jacobson* (1965) 63 Cal.2d 319, 327.)

*Ochoa*, 19 Cal. 4th at 404-05.

The record demonstrates that the jury was given an instruction that the corpus delicti must be proved independent of any admission by the defendant. CT 277. Furthermore, defense counsel addressed petitioner's oral admission about having cocaine and argued "what the law says about that is look at that with caution. It says to look at that with caution because what I talked to you earlier about, about Officer Debeaubien and her surefire recollection of things, when we know she can say she's sure and really she's completely wrong." RT 498. As discussed above, the evidence at trial included, at a minimum, "slight corroborating facts" to show that a crime had been committed, including the blood test indicating that petitioner had used cocaine within the past 6 to 72 hours, and physical evidence of cocaine contained in a bindle that was booked into evidence. Petitioner has not, therefore, demonstrated that absent Miller's

testimony, the evidence corroborating his own admission of cocaine possession was insufficient under the corpus delicti rule.

The strength of the corroborating evidence of cocaine possession weighs in favor of finding harmless error.

### 4.    Extent of Cross-Examination Permitted

The record demonstrates that before the federal charges were filed against Miller, defense counsel had an opportunity to cross-examine Miller at the preliminary examination, but did not question him.  In seeking to exclude Miller's testimony at trial, defense counsel vigorously argued that significant impeachment material was not known to the defense until the federal charges were filed against Miller, and that if the allegations against Miller had been known at the time of the preliminary examination, Miller would not have testified because he would have asserted his Fifth Amendment privilege at that time.  RT 353-54.  As argued by the prosecutor, however, defense counsel chose not to impeach Miller on the issues of discovering either the methamphetamine or the cocaine when he had the opportunity to do so at the preliminary examination, suggesting that there was no genuine dispute whether the drugs belonged to petitioner or the drugs might have been planted.  RT 349-50.

Because defense counsel did not have an opportunity to impeach Miller about the criminal charges against him, this factor weighs against a finding that the Confrontation Clause error was harmless.

### 5.    Overall Strength of Prosecution's Case

#### a.    Methamphetamine

To show that the prosecution's possession case relied solely on Miller's testimony that he found the methamphetamine, petitioner contends that Officer Kassel testified that none of the three officers who examined petitioner's wallet when it was first recovered at the scene, that is, Officers Debeaubien, Kassel and Miller, found any bindles of methamphetamine at the scene, but then at the evidence lab, Miller "ostentatiously declared: 'Look what we have here,' and showed Kassel the two bindles."  Traverse at 15

n. 9 (citing RT 97-100).  This particular testimony cited by petitioner was not heard by the jury at trial, but was given by Officer Kassel at the hearing on the motions in limine. Nevertheless, petitioner suggests that Miller could have planted the bindle in his wallet before Officer Kassel saw Miller take inventory of the wallet, in light of the evidence that neither Officer Debeaubien nor Officer Kassel personally saw the bindle in the wallet. Officer Debeaubien testified that she did not go thoroughly through the entire contents of the wallet when she collected evidence at the scene, and that she was looking through the wallet for identification.  RT 241.  Officer Kassel also testified that he went through the wallet looking for identification, but did not find any bindle in the wallet.  RT 302-03.

Anticipating a defense argument that the drugs were planted, the prosecutor argued in closing that it was reasonable that Officers Debeaubien and Kassel did not find the methamphetamine in the wallet "when you consider the wallet . . . as with all the stuff in it."  RT 479.  The prosecutor also pointed out that Officers Debeaubien and Kassel "aren't doing a search of the wallet for drugs.  She testified she was simply trying to get I.D. information on who this person was they had before them.  Kassel is just kind of a standby guy who's leafing through the same thing too.  Could he have missed that? Absolutely."  RT 480.  Defense counsel subsequently pointed out in closing that Miller was not available to explain how he discovered the bindle in petitioner's wallet, and argued that the uncertainty about how the methamphetamine was discovered raised many unanswered questions:

> But I'd like to ask David Miller how did you find this methamphetamine?  We had two other officers go through this and not find anything until it got in David Miller's hands. Remember that?  They say, oh, you know, we didn't really look that close.
>
> Well, why would they say that?  They're saying that to cover this.  They don't know how it came out.  They want to prosecute this case, they want to get a conviction.  They're new officers.  But what do we have?  They go through it, they're looking for I.D.  You look at this, there's one bindle there.  It's not a small bindle.  The first one, the one that the residue was in, that's not small.  That's pretty good size.  Fit like this?  Fit like that?  Sure.

1
2
3

And maybe if it's just one says I didn't find anything, okay. Not one, two. Two officers go through it, don't find anything. David Miller, who we don't have here, "I found it." Do we know where he found it? We don't quite even know that, do we?

4
5
6

You recall his preliminary examination testimony that was read to you. He claimed he pulled it out of the wallet at the scene down there at 1214 Apollo. But we have Officer Kassel says, I saw him pull it out of the wallet at the evidence locker, the evidence room there, kind of with a sarcastic -- I think his term was "sarcastic." "Hey, look what we got."

7
8
9
10

I don't know. I don't know what the motivation is. I could make some certain guesses. Him being investigated, he wants to show he's doing bang-up investigation work here. He wants to cover himself. He's attempting to increase his stature in the department because he's going to be charged with crimes? I don't know.

11
12
13

I'd like to ask him, did you know you were being investigated for helping these houses of prostitution? Do those houses of prostitution involve any type of drug involvement, either you or the women who work there? I'd like to ask him all those questions, but I can't.

14
15

But I can say that it's something you should certainly consider, especially with this methamphetamine, where's this coming from? Because we have officers go through it, and they don't see it, and all of a sudden it shows up.

16   RT 494-96.

17        The jury was presented with this defense argument suggesting the possibility that

18   Miller could have planted the methamphetamine in petitioner's wallet before examining it

19   in the evidence lab, and determined that these speculations did not raise reasonable

20   doubt as to whether petitioner possessed the methamphetamine found by the police.  In

21   light of the evidence in the record, including the physical evidence of the bindle

22   containing methamphetamine and Officer Kassel's testimony that he saw Miller take the

23   bindle out of petitioner's wallet and conduct a presumptive test, the prosecution

24   presented a strong case to support the conviction on the methamphetamine possession

25   count.

26              **b.     Cocaine**

27        Similarly, the prosecution presented a strong case to support the jury's finding of

28   cocaine possession, even without Miller's prior testimony that he searched for petitioner's

United States District Court
Northern District of California

United States District Court
Northern District of California

1    jacket in the car at the tow lot and found a bindle in the jacket.  At closing, the prosecutor

2    focused on petitioner's response to Officer Debeaubien when she told him "'You're being

3    charged with possession of weapons, you're being charged with possession of meth.'

4    Obviously she's telling him we found weapons, we found meth.  What does he say?  Did

5    you find the coke in my jacket?'"  RT 454.  The prosecutor pointed out that the counts

6    charging possession of guns while he was in the possession of cocaine were supported

7    by evidence that petitioner "exercised control or the right to control an amount of a

8    controlled substance.  The defendant did that.  He put the coke in his jacket.  He knew of

9    its presence.  Unfortunately for him, he was apparently the only one who did know of its

10   presence, because the police hadn't found it, and somebody had to go out to the tow

11   yard, in this case it was Officer Miller, and get it from the vomit-covered jacket."  RT 459.

12        The evidence at trial also showed that the bindle taken out of petitioner's jacket

13   that was booked into evidence contained cocaine.  In closing argument, defense counsel

14   questioned whether Miller found the cocaine in the jacket at the tow yard as he reported,

15   and attempted to raise a reasonable doubt as to whether Miller actually found the bindle

16   of cocaine in petitioner's jacket.  RT 498-500.  The prosecutor emphasized in rebuttal that

17   there was no evidence to suggest that Miller fabricated evidence of drugs, only

18   speculation by the defense.  RT 509-11.

19        The prosecutor also emphasized the presence of B.E. in petitioner's blood,

20   indicating that cocaine had metabolized within the past 6 and 72 hours.  The prosecutor

21   specifically argued that this physical evidence of recent cocaine use contradicted the

22   suggestion that Miller could have planted evidence of cocaine possession after petitioner

23   was arrested because "[i]t's wholly inconsistent with medical evidence."  RT 478.

24   Standing alone, the blood test results would not be sufficient to establish recent cocaine

25   use, as defense counsel argued: "What we don't have here is whether that B.E. relates to

26   this particular cocaine.  We don't have a time frame here for that B.E.  Is it six hours or 72

27   hours?  Might not show recent use at all."  RT 496.  However, when the blood test is

28   considered in the context of the other evidence at trial, including petitioner's admission to

Officer Debeaubien that cocaine would be found in his jacket and the physical evidence of the bindle of cocaine reportedly found there, there was strong evidence of cocaine possession without relying on Miller's prior testimony.

Applying the *Van Arsdall* factors, the court concludes that in light of the overall strength of the prosecution's case, including the evidence presented at trial and the arguments made to the jury, the Confrontation Clause error in this case did not have a substantial and injurious effect or influence in determining the jury's verdict because the jury heard and rejected defense counsel's contentions that Miller could have fabricated the drug evidence.  The *Van Arsdall* factors weighing against a finding of harmless error are limited to the question raised by the defense whether Miller planted the drug evidence among petitioner's personal belongings, particularly (1) the importance of Miller's testimony that he found the drugs in petitioner's wallet and jacket; (2) Miller's testimony that he found the bindle of cocaine in petitioner's jacket in the towed car was not cumulative and there was no evidence to corroborate Miller's statement that he found the bindle there; (3) the inconsistency between Officer Kassel's testimony suggesting that Miller was in the evidence room  when he discovered the methamphetamine in petitioner's wallet, and Miller's prior testimony that he conducted a presumptive test in the field; and (4) defense counsel's inability to cross-examine Miller about the criminal charges against him and how those allegations might be related to the drug evidence found in petitioner's case.  The record shows, however, that defense counsel pointed out these evidentiary lapses to the jury.  Despite vigorous argument by defense counsel suggesting that Miller could have fabricated the drug evidence, the jury determined, in light of the physical evidence of the drugs that were recovered, the forensic analysis of the drugs, petitioner's blood test results, petitioner's admission that he had cocaine in his jacket, and testimonial evidence by other police officers, that there was no reasonable doubt that Miller found a bindle of methamphetamine in petitioner's wallet and a bindle of cocaine in petitioner's jacket.

1    Having conducted an independent review of the record, the court determines that

2    the Confrontation Clause violation was harmless error.  Therefore, the state court's

3    decision was neither contrary to, nor an unreasonable application of, clearly established

4    federal law.

**CONCLUSION**

6    For the reasons set forth above, the second amended petition for a writ of habeas

7    corpus is DENIED.  This order fully adjudicates the petition and terminates all pending

8    motions.  The clerk shall close the file.

**CERTIFICATE OF APPEALABILITY**

10   To obtain a certificate of appealability, petitioner must make "a substantial showing

11   of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "Where a district court has

12   rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c)

13   is straightforward: The petitioner must demonstrate that reasonable jurists would find the

14   district court's assessment of the constitutional claims debatable or wrong."  *Slack v.*

15   *McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a

16   COA to indicate which issues satisfy the COA standard.  Here, the court finds that the

17   Confrontation Clause claim presented in the second amended habeas petition meets that

18   standard.  Accordingly, the court GRANTS the COA as to that claim.  *See generally*

19   *Miller-El*, 537 U.S. at 335-38.

20   **IT IS SO ORDERED.**

21   Dated: September 21, 2015

22   _____

23   PHYLLIS J. HAMILTON
     United States District Judge